[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 479 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 480 
The question presented is whether persons insured, and who have given deposit notes and have thus become members of the corporation, are liable to be assessed for losses to an amount exceeding the proportion which their premium notes bear to all the premium notes subject to assessment for such losses, where it has happened that the makers of some of the notes are irresponsible. Assessments upon some of the deposit notes held by the company, including those given by the respondents, were made by the directors before the company failed. The respondents and some of the others paid these assessments; but a part of the persons assessed failed to pay, and the company was unable to collect of them. The losses which these assessments were designed to pay consequently remained in part unpaid. When the receiver came to make assessments upon the same notes, he included, as a part of the amount to be raised by the new assessments, the unpaid balance of the former assessments which ought to have been paid by the delinquent members. If the balance cannot thus be reassessed, the claims for losses will fail to be paid in full. The consequences of the failure of the delinquent members must fall either upon those having claims for losses, or upon the solvent members of the corporation, in proportion to the amount for which each is insured, or, in other words, in proportion to the amounts in which they are respectively interested in the company. If this were a stock company, and the members were interested in the stock in the same manner in which these parties are interested in the contracts for indemnity against fire, losses which should arise from *Page 481 
the failure of the debtors of the company would be borne in proportion to the amount which each member owned in the stock. But the company has no stock and no capital, in the usual sense of that term. The scheme provided by the statute is that a number of persons, upon complying with certain formalities, may become the insurers of each other. The means of indemnity, which in other companies is furnished by persons possessed of capital, and which is or ought to be invested in some secure manner, — in these companies consists, mainly, in the written engagements of the members. As the insured are required to enter into these engagements in proportion to the amount which they respectively insure, and the nature of the risk, the interest and profits, which in other companies are paid to the stockholders, are saved to persons insuring in these mutual companies. Each member sustains a double relation to the corporate body. As an assured party he enters into a contract with the corporation, in the same form and essentially of the same character, as ordinary contracts of insurance. The consideration for the company's promise to indemnify him is his promise to participate in the expense of indemnifying others. He receives the same engagement for indemnity against loss which assured parties in other companies receive. The theory of the act assumes that this is an effective and available contract; for in case of loss he is authorized to maintain an action on his policy against the corporation therefor, if payment be withheld for three months. (§ 9.) It would, of course, be no defence that the company had not the means of payment, or that some of the members had failed or were unable to pay assessments on their notes. It is of the nature and essence of insurance that the underwriters are to pay the insured, in case of loss, to the amount underwritten; and it would require very explicit language to hold that a system of insurance, contrived by the legislature, contained provisions which in a very probable event would allow the insurers to withhold a part of the stipulated *Page 482 
indemnity. The member again holds the relation of one of the insurers of every party having a policy in the company. In this character he is a part of an aggregate body, which engages through the agency of the corporation to make good, under certain qualifications, the losses which any of the parties may sustain within the amount stipulated. But the engagement of each member is several. In case of loss, every one is to pay in proportion to the amount of his premium note. (§ 8.) It is not said, in terms, that he is to pay only such proportion of the whole loss as his premium note bears to all the premium notes held by the company at the time of the loss. If this language had been used, it would embrace all such notes, good and bad, available and unavailable, and would sustain the respondents' position. The language actually used would be satisfied by holding that each member is to pay such proportion of the loss, as the amount of his note bears to the amount of all the notes upon which payments can be enforced. Thus understood, it would be equivalent to a provision that, as among themselves, the actual contributors should pay ratably in proportion to their premium notes; and this, in my opinion, is the true construction of the section. It does not do any violence to the language; for one of the terms of the proportion is left unexpressed, and is to be supplied by construction. The respondents' counsel argues that this term is the nominal amount of all the premium notes held by the company at the time of the loss. The counsel for the appellant, on the other hand, maintains that it is the aggregate of the notes of all the actual contributors, in other words, all the available notes; and that in arriving at it, the receiver is to omit, as he has done, the notes of all those who are ascertained to be unable to pay. Now the insolvency of the makers of these notes is not much more improbable than the failure of debtors of any other class. The company is authorized to insure upon goods, as well as upon buildings, and for notes *Page 483 
taken in such cases there is nothing but personal security; and where the insurances are for a term of years, and the notes, as in this case, are very numerous, the chance that some of the makers will be unable to pay is greater than that they will all remain solvent; and where the insurance is upon buildings, no lien can be perfected unless the property is situated in this state; and I apprehend it will not always be found that the requisite memorandum will be made to perfect the lien, where it can legally be done. Where such an omission occurs it is no more the fault of the assured than of the other members. It is owing to the negligence of their common agents, the officers of the company, and the consequences should be shared by all, in proportion to their respective interests. I am led to adopt the appellant's construction, mainly, from the consideration that it best effectuates the design of the act by enabling the company to fulfill its engagements to indemnify the assured parties according to the terms of their contracts, and that it is not contrary to the language of the statute. Indeed I do not see how to answer the argument of the appellant's counsel, that upon the other construction a company, having some insolvent members, must necessarily fail whenever the occurrence of a loss compels it to make an assessment. If it can only assess to the amount of the loss and the necessary expenses, and if such assessments must be upon all the members, good and bad, the portion of such loss which ought to be paid by the insolvent members must be left unpaid; and as the insured is entitled to recover the whole amount of his insurance, there will necessarily be a balance which there will be no means of paying.
Certain other sections of the act were the subject of comment upon the argument. The sixth declares that the remainder of the premium note, deducting the five per cent to be paid down, "shall be payable, in part or the whole, at any time when the directors shall deem the same requisite for the payment of losses by fire,"c. I do not think this *Page 484 
confers an arbitrary discretion on the directors, but I am of opinion that it is controlled by the explicit provisions of the eighth section, stating the proportions in which the members shall be liable for losses, and of the tenth section to be presently mentioned. So of the provision at the end of the sixth section, directing the notes to be relinquished and given up after expiration of the term of insurance, after deducting all losses and expenses occurring during said term. This, of course, refers to the proportion of the losses which the maker is bound to pay; and I do not see that the provision has any influence upon the question we are considering. The purpose of section ten appears to be to give some practical directions for the making of assessments and to declare the manner of enforcing their payment. When the directors shall receive notice of a loss, or when a judgment shall be rendered against the company, they are to determine the amount payable "by the several members thereof as their respective proportions of such loss," and to publish such apportionment; which sum, so to be paid by the respective members, "shall always be in proportion to the original amount of his deposit note or notes." If payment is not made in thirty days after the publication of notice, the whole amount of the deposit note may be recovered against the delinquent; and it is to remain in the treasury, "subject to the payment to such losses and expenses as have or may thereafter accrue," and the balance is to be paid to the maker after thirty days from the expiration of his policy. It is not perceived that these provisions qualify in any manner the language of section eight, as regards the proportions of the losses which the members are made liable to pay. The idea is repeated that the contribution is to be in proportion to the premium note, without carrying out in language all the elements by which the problem is to be worked out. It is argued that the direction to settle the amount payable "by the several members" requires the assessment to be made upon all of them, *Page 485 
though some may be notoriously insolvent. I think the assessment should in the first instance be upon all, and that before those who pay can be charged with the shares of those who fail to pay, an effort to collect the deposit notes should be made. But the original amount of the deposit note is to be taken in ascertaining the proportion, though it may have been reduced by prior assessments. This is just, and in harmony with the theory upon which the system is founded. A person becoming a member by taking out a policy and giving a deposit note comes in upon the same footing as the then existing members, in proportion to the amount of his deposit note. It is of no importance to him that the other members have been assessed for and have paid losses, which happened before his time. They are entitled to indemnity from the company in case of loss to the amount for which they were originally insured. If a loss afterwards happens, their original note and not the balance, deducting their contribution paid before their new associate joined, should regulate the proportion of their contribution to such subsequent loss. If the whole amount of a note is collected on account of a default in paying an installment, it should, of course, await the expiration of the policy in order that it may be seen whether further liabilities are incurred by the happening of other losses. The question before the court was incidentally referred to in Brown
v. Williams (28 Maine, 15 Shepl., 252). A mutual company had taken a policy upon a building, under a representation that the land was owned by the assured. It turned out that he had only a bond for a deed. A loss having occurred, the company defended, successfully, a suit on the policy on the ground of this misrepresentation. The court said the company could have no lien on the estate insured because the party had no title. They add: "The misrepresentation, therefore, was materially untrue; for each member of the company was interested in having such a security from every other member thereof, as would insure *Page 486 
the payment of his proportion of any losses occuring during their mutual membership. If an assessment upon one should fail to be collected, it must be assessed upon the others."
The obligation to contribute among the members of these companies closely resembles that which prevails among several sureties for a common principal. The rule in equity, in such cases, is to divide the whole loss among the solvent sureties. (1Story's Eq. Juris., § 496.) I am of opinion that the order of the general term should be reversed and that of the special term affirmed.
GARDINER, CH. J., JOHNSON, CRIPPEN, DEAN and MARVIN, Js., concurred in the foregoing opinion. RUGGLES, J., took no part in the decision.
HAND, J., dissented and delivered an opinion in favor of affirming the order made by the general term.
Order of the general term reversed, and that made at special term affirmed.